UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| In the Matter of the June 12, 2012 South Carolina Primary Elections <br> _____ <br><br> Amanda Somers, Candidate for South Carolina State Senate District 5, and all other Properly-Filed Candidates Involved in the June 12, 2012 South Carolina Primary Elections, <br><br> Candidate Plaintiffs, <br><br> and <br><br> All Persons Entitled to Vote Under the Uniformed and Overseas Citizens Absentee Voting Act ex rel. Amanda Somers, Candidate for South Carolina State Senate District 5, <br><br> Military and Overseas Voter Plaintiffs, <br><br> v. <br><br> All Improperly-Field (sic) Candidates Involved in the June 12, 2012 South Carolina Primary Elections, <br> Candidate Defendants, <br> and <br><br> The South Carolina State Election Commission, the South Carolina State Ethics Election Commission, all Affected County Election Commissions, all Affected State and County political parties, and all Affected Election Officials Not Otherwise Named, <br><br> Election Official Defendants. | Civil Action No. 3:12-cv-01191-CWC <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> **RESPONSE OF DEFENDANT SOUTH CAROLINA STATE ELECTION COMMISSION TO PLAINTIFFS' MEMORANDUM RE STANDING AND MERITS OF UOCAVA CLAIM** |

In accordance with the May 10, 2012 order of this Court, Defendant South Carolina State

Election Commission (Election Commission) herein submits this Memorandum of Law in

1

response to the Memorandum of Law filed on behalf of Amanda Somers, Candidate for South Carolina State Senate District 5 (Somers or Plaintiff).  First, Defendant Election Commission is uncertain as to who claims to be the actual plaintiff(s) in this case.   During the Status Conference, Plaintiff's counsel appeared to argue that Somers was the plaintiff but volunteered to:

> "restyle[1] the pleadings to where anyone who is represented by me or by Mr. Pettigrew, if he ends up getting in as a plaintiff, and whoever else, is a plaintiff, and everyone else is a defendant.  I am -- I have no position as to which is right or which is wrong."

(Tr. p. 31, ll. 6-11).

In the Plaintiff's Memorandum the case caption has been "restyled" to name as plaintiff "All Persons Entitled to Vote Under the Uniformed and Overseas Citizens Absentee Voting Act _ex rel._ Amanda Somers."  Further, Plaintiff has deleted all originally named defendants from the case caption, excepting only the Election Commission.[2]  However, the Plaintiff's Complaint and Memorandum state that each is submitted on behalf of "Plaintiff Amanda Somers".   For purposes of Election Commission's response, we are responding to Somers individually and her effort to bring an _ex rel_ action on behalf of Uniform and Overseas Citizens Absentee Voting Act voters. The Election Commission contends that:

1. Plaintiff does not have standing to bring this action under the Voting Rights Act of 1965 (VRA);

2. The transmission of UOCAVA and the    Military and Overseas Voter Empowerment Act (MOVE Act) (collectively, UOCAVA) absentee ballots

---

[1] Election Commission is unaware of any F.R.C.P. that allows Plaintiffs to "restyle" the pleading, certainly not without leave of the Court.
[2] To the extent that plaintiffs have attempted to drop plaintiffs and defendants listed in the Complaint, Election Commission has no objection and consents to the same.

containing only names of candidates for federal office without the names of

candidates for State and local offices on or before April 28, 2012, or thereafter

does not constitute a change in pattern or practice requiring preclearance under

Section 5 of the VRA; and

3. Plaintiff is not entitled to relief as she has sought none.

## BACKGROUND

This federal action arises from a decision of The Supreme Court of South Carolina (S.C.

Court) in the original jurisdiction.  As the S.C. Court stated:

> This is a matter in the Court's original jurisdiction seeking declaratory relief in
> connection with a dispute as to the requirements for a candidate's name to
> properly appear on a primary election ballot.  We are asked to construe the
> meaning of  S.C. Code Ann. § 8-13-1356 (Supp. 2011), which provides that "[a]
> candidate must file a statement of economic interests for the preceding calendar
> year at the same time and with the same official with whom the candidate files a
> declaration of candidacy or petition for nomination."  Under longstanding rules of
> statutory construction, we find the statute means what it says.

Anderson v. South Carolina State Election Commission, (issued Opinion No. 27120 on May 2,

2012, p. 1 and denied Petition for Rehearing by Way of Clarification on May 3, 2012).  Exhibit

1.  The primary election process is governed, in relevant part, by South Carolina Code Annotated

Title 7, Chapters 11 and 13 (Supp. 2011).

On April 16, 2012, Michael Anderson, through his attorney, requested that Marci

Andino, Executive Director of the Election Commission (Andino), Dick Harpootlian, Chairman

of the South Carolina Democratic Party, and Chad Connelly, Chairman of the South Carolina

Republican Party, remove certain "purported candidates from the 2012 Party Primary ballot"

because the nomination candidates purportedly had not complied with the requirement of S.C.

Code Ann. § 8-13-1356 (Supp. 2011) by timely filing a Statement of Economic Interest (SEI) at

the same time and with the same official with whom the candidate was required to file the

Statement of Intent of Candidacy (SIC). Exhibit 2.  On April 18, 2012, Andino informed counsel that "[t]he State Election Commission is not given the authority to determine if a candidate certified by a political party meets the qualifications to hold office or if the candidate completed the filing process properly" and deferred to the political parties or the courts for resolution of the matter.  Exhibit 3.

On April 18, 2012, Plaintiffs-Petitioners Michael Anderson and Robert G. Barger (S.C. Court Plaintiffs) petitioned the S.C. Court to accept this matter in its original jurisdiction and moved to expedite the matter.  On April 19, 2012, Defendant-Respondents Election Commission and Andino (collectively, State Defendants) replied to S.C. Court Plaintiffs' Petition for Original Jurisdiction and Motion to Expedite and filed a proposed Answer and Cross Claim against the remaining Defendants-Respondents.  State Defendants joined S.C. Court Plaintiffs in requesting that the Supreme Court hear the matter in its original jurisdiction and expedite the matter.

On April 20, 2012, the S.C. Court issued its Order granting the original jurisdiction petition and expediting the matter and issued a scheduling order requiring the Defendants-Respondents to answer, requiring a record on appeal, allowing the parties to file memoranda of law, scheduling oral argument, and enjoining the Election Commission "from sending out the ballots affected by this matter until further order of this Court."  Anderson, Order dated April 20, 2012, attached hereto as Exhibit 4.  On April 20, 2012, Andino, as the State's chief election official responsible for implementing and enforcing South Carolina's responsibilities under UOCAVA,[3] via e-mail asked election officials for all 46 counties not to transmit UOCAVA ballots for state and local nomination candidates until further order of the Court.  Exhibit 5, Andino e-mail dated April 20, 2012 to County Election Officials

---

[3] See S.C Code Ann. § 7-3-20(12) (Supp. 2011).

On April 23, 2012, counsel for the State Defendants sent a letter to the S.C. Court informing it that because congressional nomination candidates are not subject to the provision of S.C. Code Ann. § 8-13-1356 (Supp. 2011), the Election Commission authorized the county election commissions to transmit <u>only</u> the UOCAVA absentee ballots that contain names of the congressional candidates in congressional districts where there are primary contests as these candidates do not appear to be affected by the <u>Anderson</u> case.  Exhibit 6.

Pursuant to the Court's April 20, 2012 Order, the following pleadings were filed: 1) State Defendants filed an Amended Answer and Amended Cross Claim; 2) Defendant-Respondents South Carolina Democratic Party (SCDP), Richard A. Harpootlian, as Chair of the Executive Committee and as a representative of the SCDP (Harpootlian), and the Lexington County Democratic Party (LCDP) and Kathy Hensley, as Chair of and as a representative of the LCDP (Hensley), filed their Answer, Cross Answer and Cross Claim with the Court and filed a Memorandum in Support; 3) Defendant-Respondents South Carolina Republican Party (SCRP), Chad Connelly, as Chair of the Executive Committee and as a representative of the SCRP (Connelly) and the Lexington County Republican Party (LCRP) and Steve Isom, as Chair of and as a representative of the LCRP (Isom), filed their Answer to the Complaint of Plaintiffs and Amended-Cross Claim of State Defendants; and 4) the Lexington County Commission of Registration and Elections (LCEC) and Dean Crepes, as Director of and as a representative of the LCEC filed its Answer.

On April 27, 2012, the parties filed their respective memoranda of law with the S.C. Court.  On May 1, 2012, the S.C. Court heard oral argument from the parties and on May 2, 2012 issued its Order in <u>Anderson</u>.  On May 3, 2012, the State Defendants, the SCDP, and the SCRP

sought rehearing and clarification of the May 2, 2012 Order.  Exhibit 7.  On May 3, 2012, the

S.C. Court issued its order denying rehearing and clarifying the Order, holding:

> As to the request for clarification, the parties' contention that our opinion holds §
> 8-13-1356 is satisfied if an individual, when filing a Statement of Intention of
> Candidacy (SIC), provides the political party with a paper copy of a Statement of
> Economic Interest (SEI), whether previously electronically filed or not, is correct.
> However, we reject the parties' contention that our opinion allows compliance
> with the statute in any other fashion.

Exhibit 8.

On Friday, May 4, 2012, Somers filed the instant action[4].  Defendant Election

Commission filed a Motion to Dismiss and for Summary Judgment on Monday, May 7, 2012,

and filed its Answer on Tuesday May 8, 2012.  On Thursday, May 10, 2012, the Hon. Cameron

McGowan Currie (Judge Currie) held a status conference (Status Conference) with Plaintiffs and

Defendant Election Commission, the only defendant upon whom the summons and complaint

had been served.  Shortly before the Status Conference, John W. Pettigrew, Jr., a candidate for

South Carolina Senate District 25 who had been removed from the ballot pursuant to Anderson,

moved to intervene as an intervener plaintiff.

During the status conference, counsel for Plaintiff conceded to Judge Currie that

plaintiffs were seeking relief under the VRA and requested that a three (3) judge panel be

convened.  Pettigrew was granted status as an intervener plaintiff.  Judge Currie issued a

scheduling order and requested that a three judge panel be appointed to hear the matter.

On Friday, May 11, 2012, Somers notified Judge Currie that she had abandoned all

claims in her federal action other than "as to the military ballot issue."  Pettigrew filed a motion

---

[4] Also pending is a state court action filed by Amanda Somers on April 18, 2012, alleging her
primary was improperly reopened wherein the State Commission is also named as a Defendant.

seeking to withdraw as an intervener plaintiff and asking the Court for an appropriate order, which the three judge panel issued on May 11, 2012.

Finally, on May 11, 2012, Somer's filed her "Memorandum Re Standing and Merits of UOCAVA Claim" (Plaintiff's Memorandum).  Based upon Plaintiff's Memorandum, it appears that the only remaining argument Somers is making is that the Election Commission "precleared baseline practice for handling UOCAVA ballots has been to include both state and federal races on these ballots" and that, for the June 12, 2012 primary, the Election Commission deviated from that practice by creating two ballots, thereby "segregating the federal and state offices."

## DISCUSSION

The single remaining issue before this Court is whether the Election Commission's authorization for the county election commissions (County Commissions) to transmit <u>only</u> the UOCAVA absentee ballots that contain names of the congressional candidates in congressional districts where there are primary contests on April 20, 2012 comports with the VRA.

The State of South Carolina is a covered jurisdiction under the VRA.  The VRA provides, in pertinent part:

> No voting qualification or prerequisite to voting or standard practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

42 USCA § 1973(a).  A violation of 42 USCA § 1973(a) occurs when a political process leading to the nomination in a covered jurisdiction is not open equally to participation by a protected class of persons protected under the VRA to elect representatives of their choice.  42 USCA § 1973(b).  Plaintiff appears only to argue now that "[t]he two-ballot system appears to be a newly created practice that has not been precleared by the U.S. Department of Justice pursuant to

Section 5 of the Voting Rights Act."  However, nowhere does Plaintiff state how she or any other potential Plaintiff is injured by the "two-ballot" system.

I.        Plaintiff Lacks Standing To Pursue This Matter Under The VRA.

As Judge Currie stated during the Status Conference on May 10, 2012:  "The federal court does have jurisdiction if an individual with standing brings a claim under the Voting Rights Act." Tr., p. 56, ll. 19-21.  (Emphasis added)

Plaintiff has failed to allege any facts giving rise to standing.[5]  A private party, such as the Plaintiff in this case, can only have standing under the Civil Rights Act provision at 42 U.S.C.A. § 1983 that provides for a civil action for deprivation of voting rights to assert the substantive provisions of the VRA if the party has suffered an injury that is more than a generalized grievance.

Article III of the United States Constitution limits the power of the federal courts only to adjudicate "cases or controversies."  U.S. Const. art. III, § 2; Flast v. Cohen, 392 U.S. 83, 94, 88 S. Ct. 1942, 1949 (1968).  Thus, a plaintiff must establish some threatened or actual injury to his rights, a "concrete adverseness" the court must pass judgment upon, to invoke the jurisdiction of the federal courts.  O'Shea v. Littleton, 414 U.S. 488, 494, 94 S. Ct. 669, 675 (1974).  Article III, section 2's requirement for a case or controversy is the foundation for the concept of justiciability.  See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341, 126 S. Ct. 1854, 1861 (2006) ("[N]o principle is more fundamental to the judiciary's proper role in our system of

---

[5] Plaintiff cherry-picks convenient language from Bullock v. Carter, 405 U.S. 134, 92 S. Ct. 849 (1972) but fails to provide the context of that case. Bullock is clearly distinguishable from the case at hand.  In Bullock, the United States Supreme Court addressed the constitutionality of Texas's primary filing-fee scheme, and ultimately held the exorbitant filing fees effectively allowed access to the ballot to only those candidates with a financially flush supporter base, thereby depriving voters of their choice of representative candidates.  The thrust of the Bullock case was whether a state law limited candidate access to the ballot based upon financial resources and had an impact upon the rights of the voters.

government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (quoting Raines v. Byrd, 521 U.S. 811, 818, 117 S. Ct. 2312 (1997)).

Relevant to the case at hand, is the United States Supreme Court's holding that:

... no justiciable controversy is presented when the parties seek adjudication of only a political question, when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been mooted by subsequent developments, and **when there is no standing to maintain the action**.

Flast v. Cohen, 392 U.S. 83, 95, 88 S. Ct. 1942, 1950 (emphasis added).

As a threshold matter, the burden to establish Article III standing is on the Plaintiff, the party invoking federal jurisdiction. U.S. Const. art. III, §2, cl. 1.  Article III standing is threshold inquiry that in no way depends on merits of petitioner's contention that particular conduct is illegal. U.S. Const. art. III, §2, cl. 1.  To establish Article III standing, complainant must show: (1) personal injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) causal connection between injury and conduct complained of; and (3) that it is likely, rather than merely speculative, that injury will be redressed by relief requested.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130 (1992).  See also DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342, 126 S. Ct. 1854, 1861,(2006) ("The requisite elements of this 'core component derived directly from the Constitution' are familiar: 'A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'"); Los Angeles v. Lyons, 461 U.S. 95, 101–02, 103 S. Ct. 1660, 1665 (1983) (plaintiffs must demonstrate "a personal stake in the outcome"; "[a]bstract injury is not enough").  Here, Plaintiff has failed both to meet her burden and to establish any of the three elements of Article III standing.

Plaintiff makes the following broad and vague allegations:

4. Plaintiff Somers also brings a claim ex relatione on behalf of South Carolinians presently absent from the country in military service or for other reasons who would choose to vote for her or someone else in the June 12, 2012 South Carolina Primary Election on a Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") ballot but cannot because the deadline for sending such ballots has been missed.

\* \* \*

9. These decisions, orders, writs, and altered election practices have now caused South Carolina to violate the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") and the Military and Overseas Empowerment Act ("MOVE Act"). Not one of the decisions, orders, writs, or altered election practices even mentions UOCAVA or the MOVE Act.

10. UOCAVA and the MOVE Act required the South Carolina Election Commission to send ballots to military and other overseas voters at least 45 days before the election. That deadline was April 28, 2012—and it came and went with no ballots being sent to military and other overseas voters as required by federal law.

11. It is not an overstatement to say that practically every person in South Carolina charged with overseeing the June 12, 2012 South Carolina Primary Election has failed to comply with basic requirements of due process or the requirements of several federal laws applicable to South Carolina state elections.

12. These problems are now actively disenfranchising military and overseas voters in direct violation of federal law.

\* \* \*

21. All candidates and their supporters and voters, all military and overseas voters, and the various election officials are being severely prejudiced by this chaos. Many candidates will not know they have been thrown off the ballot until the ballots have all been printed. Candidates without email, or who do not regularly check their email, are completely out of luck because the requests for information about filing details were only sent by email. These candidates will be thrown off the ballot even if they legitimately should stay, simply because they did not timely check their email and reply, saying they did things the right way.

32. That any new un-precleared changes to South Carolina's election practices and procedures will not only violate the Voting Rights Act but also UOCAVA and the MOVE Act.

May 4, 2012 Complaint.

Plaintiff has not alleged any facts sufficient to establish the requisite injury in fact, to

trace any alleged injuries to a violation of and enforcement of the VRA, or to establish that those

alleged injuries can be redressed in this action, as Plaintiff does not seek any particular relief. Plaintiff merely "submit[s] that appropriate relief can be determined after" the filing of the Election Commission memorandum.  As such, Plaintiff does not have standing to bring this broad and vague challenge under Section 5 of the VRA.

Additionally, because Plaintiff is not in a minority who the VRA is intended to protect, she must also meet additional, more stringent, standing requirements:

> The test for standing of a non-minority plaintiff in a Voting Rights Act cause of action was addressed in Newman v. Voinovich.  Newman instructs that a plaintiff must show:
>
> 1) he or she has personally suffered or will suffer some distinct injury-in-fact as a result of defendant's putatively illegal conduct;
> 2) the injury can be traced with some degree of causal certainty to the defendant's conduct;
> 3) the injury is likely to be redressed by the requested relief;
> 4) the plaintiff must assert his or her own legal rights and interests, not those of a third party;
> 5) the injury must consist of more than a generalized grievance that is shared by many; and
> 6) the plaintiff's complaint must fall within the zone of interests to be regulated or protected by the rule of law in question.

Dutmer v. City of San Antonio, 937 F. Supp. 587, 590-91 (W.D. Tex. 1996) (citing Newman v. Voinovich, 789 F. Supp. 1410, 1415 (S.D. Ohio 1992), aff'd, 986 F.2d 159 (6th Cir.), cert. denied, 509 U.S. 924, 113 S. Ct. 3041 (1993)) (internal citations omitted).

The United States Supreme Court's holding is clear that:

> Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation. The reasons are two. First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not … . Second, third parties themselves usually will be the best proponents of their own rights.

Singleton v. Wulff, 428 U.S. 106, 113–14, 96 S. Ct. 2868, 2874 (1976) (citation omitted). Because it is uncontroverted the Plaintiff is not a member of a group protected by the VRA Act, she cannot meet the standing requirements of having suffered an "injury-in-fact"; she has not alleged she has been denied the opportunity to participate in the electoral process by reason of her race or language.

Plaintiff must allege that the UOCAVA ballots have a "potential for creating inequities in the opportunities of minority and white voters to elect their preferred representatives." Dutmer v. City of San Antonio, Tex., 937 F.Supp. 587, W.D.Tex.,1996. Here, Plaintiff has made no such allegation, and it is undisputed that the UOCAVA ballots at issue in this matter will equally treat both minority and white voters. Therefore, there can be no injury.

For example, in Giles v. Ashcroft, 193 F.Supp.2d 258 (D.D.C. 2002), the Court held that that even if the Section 5 allegations in the Complaint were true, the allegations

> could essentially affect anyone within a covered jurisdiction under the Voting Rights Act (more than 146 million people in nine states). That is simply not the type of personalized injury required to establish standing. See Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S. Ct. 1601 ("Article III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant."). Such abstract injuries, arguably felt by innumerable others as well, amount to general grievances that the Supreme Court has held do not constitute "injury in fact" for standing. See Lujan, 504 U.S. at 574-576, 112 S.Ct. 2130; Los Angeles v. Lyons, 461 U.S. 95, 101-102, 103 S.Ct. 1660 (1983) (plaintiffs must demonstrate "a personal stake in the outcome"; "[a]bstract injury is not enough"). The Amended Complaint alleges a series of broad injuries that could be experienced by most citizens of Mississippi, not Giles specifically.

Similarly, here, to the extent that Plaintiff has actually alleged any injury, any alleged injury must necessarily affect all South Carolina UOCAVA voters equally without affecting Plaintiff personally or constituting an injury on account of race or color. It is undisputed that all South

Carolina UOCAVA voters are affected by the UOCAVA ballots equally, irrespective of race or color.

Plaintiff fails to meet the third requirement for standing because her case lacks redressability.  The Prayer for Relief in Plaintiff's Memorandum articulates no remedy and asserts "appropriate relief can be determined after the State Election Commission's submission ... ." (Plaintiff's Memorandum 4–5.)  The constitutional standing requirement of redressability presupposes "requested relief."  See DaimlerChrysler Corp., 547 U.S. at 342, 126 S. Ct. at 1861 ("... likely to be redressed by the requested relief").

Even if Plaintiff had alleged an actual injury caused by the Election Commission, her case must fail because she does not allege any relief this Court may provide.  It strains the bounds of reason to fathom a situation in which an injury is less "likely to be redressed" than in the instant case where the Plaintiff does not request any relief at all.   To the extent Plaintiff's counsel refers to relief in his May 7, 2012 email to the Court, the "remedy" sought is the status quo.  See Exhibit 9, Attachment E, p. 2-3.

Finally, Plaintiff has failed to address the "ex rel." designation of the caption in her Memorandum.  "Ex Relatione" is defined as "On the relation or information of."  A suit ex rel. is typically brought by the government upon the application of a private party (called a "relator") who is interested in the matter."  Black's Law Dictionary, 8th ed. 2004.  "Relator" is defined as "The real party in interest in whose name a state or an attorney general brings a lawsuit."  Black's Law Dictionary, 8th ed. 2004.  Plaintiff is incapable of bringing a lawsuit in the name of the unidentified persons she envisions are included as the Military and Overseas Voters, and she provides no legal support for her ability to do so.  Because the Plaintiff has failed to meet her

burden of establishing standing, this case should be dismissed without a hearing on or consideration of the merits.

       II.      <u>Election Commission's Compliance With UOCAVA And State Law Does Not Violate The VRA.</u>

      a.      <u>UOCAVA.</u>  By their clear and unambiguous terms, both UOCAVA, enacted in 1986, and MOVE, enacted in 2009 as an amendment to UOCAVA, only apply to the right of U.S. military and merchant marine, their family members and U.S. citizens residing outside the United States (collectively, overseas voters) to register and vote absentee for federal offices.  42 USC § 1973ff–1 (a)(4).[6]  For the June 12, 2012 primary, the only federal office on the South Carolina ballot is that of the United States House of Representatives.  There are contested political party primary races in the following congressional districts:  2nd (republican), 3rd (democratic), 4th (democratic), and 7th (democratic and republican).  Exhibit 9, Affidavit of Marci Andino dated May 13, 2012, ¶11, Attachment H.

> UOCAVA was expanded significantly in 2009, when Congress passed the Military and Overseas Voter Empowerment (MOVE) Act to provide greater protections for service members, their families and other overseas citizens. Among other provisions, the MOVE Act requires states to transmit validly-requested absentee ballots to UOCAVA voters no later than 45 days before a federal election, when the request has been received by that date, except where the state has been granted an undue hardship waiver approved by the Department of Defense for that election.

http://www.justice.gov/opa/pr/2010/October/10-crt-1212.html

      The State's responsibility under UOCAVA is prescribed in 42 U.S.C.A. § 1973ff.1. South Carolina, *inter alia,* must

- designate a single state office—Andino—to administer UOCAVA 42 U.S.C.A. § 1973ff.1(b);

---

[6] <u>See also</u>  *http://www.justice.gov/crt/about/vot/misc/activ_uoc.php#prov*.

- develop means of communication with overseas voters for registration and absentee voting, including at least one means of electronic communication 42 U.S.C.A. § 1973ff.1(e);

- transmit validly requested absentee ballots to overseas voters received at least 45 days before an election for a federal office at least 45 days prior to the election;

- when a valid request for an absentee ballot is received less that 45 days before the election, transmit the absentee ballot:  1) in accordance with State law and 2) "if practicable and as determined appropriate by the State, in a manner that expedites the transmission of such absentee ballot" (42 42 U.S.C.A. § 1973ff.1(a)(8); and

- establish a plan that allows overseas voters to vote timely in any runoff elections U.S.C.A. § 1973ff.1(a)(9).

b.    <u>Military and Overseas State Statutes</u>.    Section 7-15-110 provides the qualifications that an overseas voter must meet to be qualified to register to vote and to receive absentee ballots for federal elections.  S.C. Code Ann. § 7-15-110 (Supp. 2011).  Section 7-15-405 established the process that an overseas voter must use to request an absentee ballot for federal elections and the process used by South Carolina for overseas voter participation in primary runoff races. S.C. Code Ann. § 7-15-405 (Supp. 2011).   Section 405 provides, in pertinent part:

> (A) For the qualified electors of this State who are eligible to vote <u>as provided by the Uniformed and Overseas Citizens Absentee Voting Act</u>, set forth in the United States Code, Title 42, Section 1973ff, et seq., <u>an absentee ballot with an absentee instant runoff ballot for each potential second primary must be sent to the elector at least forty-five days prior to the primary election</u>.
> (B) The absentee instant runoff ballots for second primaries must be prepared by the authority charged with conducting the election.
> (C) The absentee instant runoff ballot for a second primary shall permit the elector to vote his order of preference for each candidate for each office by indicating a rank next to the candidate's name on the ballot.  However, the elector

shall not be required to indicate his preference for more than one candidate on the ballot if he so chooses.

(D) The special absentee ballot shall be designated as an "absentee instant runoff ballot" and be clearly distinguishable from the regular absentee ballot.

S.C. Code Ann. § 7-13-405 (Supp. 2011) (emphasis added).

For qualified State overseas voters, an absentee ballot for election to federal office must be sent at least forty-five (45) days prior to any election and if the overseas voter requests the ballot within the 45 day window, the ballot must be sent no later than that close of business the day after receipt of the request. S. C. Code Ann. 7-15 406 (Supp. 2011). Overseas voters must request the absentee ballot from the County Commission in the county in which they resided prior to going overseas. S. C. Code Ann. 7-15 330 (Supp. 2011).

The South Carolina General Assembly enacted a statute in 2006 that authorizes qualified State overseas voters to vote absentee in State and local elections. Act 253,[7] 2006 South Carolina Acts and Joint Resolutions, sec. 3, provided:

> Section 7-15-460. (A) To ensure that all South Carolina residents eligible to vote as provided by the Uniformed and Overseas Citizens Absentee Voting Act, set forth in the United States Code, Title 42, Section 1973ff, et seq., have the opportunity to receive and cast any ballot they would have been eligible to cast if they resided in and had remained in South Carolina, the State Election Commission must, in cooperation with United States government agencies, take all steps and action as may be necessary including, but not limited to, electronic transmissions of Standard Form 76 issued by the federal government as an application for voter registration and an application for absentee ballots and electronic transmissions of absentee ballots to or from any elector eligible to vote as provided by the Uniformed and Overseas Citizens Absentee Voting Act.

Act 253 was precleared by the Civil Rights Division (CRD) of the DOJ. See Exhibit 10, letter dated March 28, 2006, from John Tanner to C. Havird Jones, Jr. Act 253, 2006 expanded the

_____

[7] Prior to the 2006 amendment, Section 7-15-460 only applied to declared emergencies such as war.

absentee vote at overseas voters and enabled them to vote for any candidate on a political party primary ballot or general election ballot.[8]

This section was amended by Act 43, 2011 South Carolina Acts and Joint Resolutions, sec. 5 to include special elections and local offices in addition to the federal and statewide. Section 7-15-460 provides:

> (A) To ensure that all South Carolina residents eligible to vote as provided by the Uniformed and Overseas Citizens Absentee Voting Act, set forth in the United States Code, Title 42, Section 1973ff, et seq., have the opportunity to receive and cast any ballot they would have been eligible to cast if they resided in and had remained in South Carolina, the State Election Commission must, in cooperation with United States government agencies, take all steps and action as may be necessary including, but not limited to, electronic transmissions of Standard Form 76A, or its successor form, issued by the federal government as an application for voter registration and an application for absentee ballots and electronic transmissions of absentee ballots for all elections for federal, state, and local offices to voters in accordance with his preferred method of transmission.

Act 43 was precleared by the CRD of the DOJ. See Exhibit 11, letter dated August 22, 2011, from T. Christian Herren, Jr. to C. Havird Jones, Jr. The effect of Act 43 was to give overseas voters the right to vote absentee in municipal elections and special elections in addition to primary and general election elections.

c.      Status of State overseas absentee ballots and prior practice. Since 2006, county election commissions have included State primary and general election candidate primary and general election contested elections in the same transmission as the UOCAVA federal ballots to any qualified overseas voter timely requesting an absentee ballot. In this primary election cycle, in order to comply with UOCAVA and the Order of the S.C. Court, the Election Commission provided instructions to overseas voters as part of the primary ballot for both political parties that explained:

---

[8] Municipal elections and special elections are not on a primary or general election ballot.

17

1) the S.C. Court had enjoined the State for transmitting any State Primary ballots effected by the Anderson case, but that the ballots for the U.S. House of Representatives were being sent to comply with the UOCAVA requirement that the federal office ballots be sent 45 day prior to the election;

2) the overseas voter may also be eligible to vote in state and local offices and that once the S.C. Court rules, the voter would be sent a completed ballot in the same manner as the manner in which the overseas voter requested; and

3) the options for returning the initial ballot and the complete ballot are to either: a) wait and return the complete ballot once it is received—a preferable option for those requesting the ballot electronically (fax or email), or b) return the initial ballot and the return the complete ballot once received and if the complete ballot if returned, it will replace the initial ballot.

The Election Commission has included the option for an overseas voter to receive the overseas ballot containing both the UOCAVA federal office and the State and local primary offices.    This complies with the requirement of S.C. Code Ann § 7-15-460 that the Election Commission ensure that all South Carolina residents eligible to vote as provided by the UOCAVA have the opportunity to receive and cast ballots.

Additionally, there is no uniform time that County Election Commissions must send out UOCAVA and state ballots.  The ballots must be sent not less than 45 days (if they are received by then) but a county can send them on the 45, 46, 47, or 48 day.  Further, for any overseas voter requesting a ballot with less than 45 days remaining to the primary, the ballot must be transmitted by the close of business the day after the ballot request is received.  There simply is no uniform time that the county election commissions must transmit overseas absentee ballots.

18

In the late afternoon of May 10, 2012, the Election Commission requested that each of the 46 County Election Commissions report on the requesting that each provide the following information to her by 2:00 p.m. on Friday, March 11, 2012:

     a. Number of absentee ballots for the Congressional Districts that were sent to UOCAVA voters prior to April 28, 2012, and the method used to send the ballots (email/facsimile/U.S. Postal Service);

     b. Number of UOCAVA ballots requested/sent after April 29, 2012, and the method used to send the ballots;

     c. Number of UOCAVA voters who had been sent the complete ballot— Congressional, state, and local offices—and the method used to send the ballots; and

     d. Number of UOCAVA ballots returned by UOCAVA voters.

Attachment I to Exhibit 9 is a compilation of the 43 counties that responded to the Election Commission by today's date. Excluding the two counties that do not have primaries (Allendale and Clarendon) and the three counties (Chester, Colleton and Jasper) that did not get their information back, there have been a total of 568 UOCAVA absentee ballots requested statewide. Of those, 229 were requested prior to April 28 and the ballots were transmitted by the County Election Commissions by April 28, 2012. Of those 229, 171 of the overseas ballots were requested by e-mail and the ballot forms were transmitted by e-mail. There were 239 UOCAVA ballots requested after April 28 and of those 194 were requested by e-mail and the ballot forms were transmitted by e-mail. Greenville County which is part of Congressional District 3, had 14 UOCAVA ballot requests before April 28 and 12 of the 14 were by e-mail. The ballot form transmitted to the District 3 overseas voters prior to April 28, 2012, gave the voter the option waiting and receiving a ballot form that contained both federal and state and local primary candidates on the ballot. *See* Exhibit 9, ¶5, Attachment A.

Not only have the Election Commission and the County Election Commissions not violated UOCAVA, they have complied with the practice that has been followed since 2006 by

allowing the overseas voters the opportunity to receive their federal primary ballots and the State and local primary ballots at the same time.

### III.      Plaintiff Has Sought No Relief And Is Entitled to None.

Neither in her Complaint nor Plaintiff's Memorandum has Plaintiff set forth a demand for relief. However, on May 8, 2012, Plaintiff filed a "status report" email with the Court alleging as follows:

> 5.      As to UOCAVA and MOVE Act Ballots
> **BASELINE**: South Carolina has always sent one ballot pursuant to UOCAVA and the MOVA Act featuring all federal and state races to be decided in the election.
> **DEVIATION**: Because of the drama and chaos associated with this cycle, the South Carolina Election Commission decided to segregate the UOCAVA ballots by federal and state races and send two, not one, ballots. This change has not been precleared and is guaranteed to confuse voters immensely. Most who receive a second ballot—if and when they do—will have probably no idea what to do with it, thinking they have already lawfully voted in the June 12 primaries.
> **REMEDY**: After all issues are resolved relating to candidacy, which should happen extremely quickly given the clear-cut nature of the above issues, proper single-ballot UOCAVA ballots should be prepared and each UOCAVA requestor contacted  and the entire matter expressly explained to them so that they are not disenfranchised. Otherwise, disenfranchisement of some military and overseas ballots is absolutely guaranteed.

Here Plaintiff is seeking the same remedy set forth in the UOCAVA ballot form sent to all overseas primary voters. See Exhibit 9, ¶ 10, Attachment G.   Essentially, the "remedy" sought in this email, is the status quo.

Further, in response to Judge Currie's questioning attempting to determine the relief sought by Plaintiff, counsel stated:

> frankly, at this point in time it is not possible any longer to follow every law related to this election. It's just not possible anymore. So I think that in this kind of situation the right thing to do is to get as close as possible to complying with the law…, then the issue becomes one of relief and it is is (sic) the relief to order the election commission to quickly send out correct full ballots and the people who get them simply they just do their best.

Tr., p. 24, ll. 10-14, p. 25, l. 23-p. 26, l. 1.   To the extent that this is the relief actually sought by Plaintiff, as discussed above, the Election Commission provided the requested relief through the UOCAVA ballot form it directed the County Election Commissions to use on April 20, 2012. The ballot form (Attachment A to Exhibit 9) has already provided the relief that counsel asked for during the Status Conference, thus Plaintiff's claim is moot.

Plaintiff's failure to inform this Court of the action she seeks it to undertake violates the pleading standards established in Rule 8(a)(3), F.R.C.P., which requires a plaintiff to state "a demand for the relief sought ... ."   Because Plaintiff seeks no relief, she is entitled to none. See Ward v. Harris, 6:07-388-DCR, 2007 WL 4571074, *2 (E.D. Ky. Dec. 26, 2007) ("Failure to demand any form of relief justifies dismissal without prejudice.")

## CONCLUSION

For the reasons above-stated, Defendant Election Commission requests that the three judge panel determine that Plaintiff has no standing to bring an action under the Voting Rights Act and that there has been no violation of the Voting Rights Act.

Respectfully submitted,

M. Elizabeth Crum, Federal ID No. 372
  *lcrum@mcnair.net*
Ariail B. Kirk, Federal ID No. 9250
  *akirk@mcnair.net*
MCNAIR LAW FIRM, P.A.
Post Office Box 11390
Columbia, South Carolina 29211
(803) 799-9800

By:  s/ M. Elizabeth Crum

Attorneys for Defendant South Carolina
State Election Commission

21

May 13, 2012

Columbia, South Carolina